**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

THOMAS L. HABEL, DAVID W. HERCZEG,
KENNETH G. MEERSCHAERT, SR., and
GEOFFREY E. SMITH,

                        Plaintiffs,

v.

MACOMB TOWNSHIP, JOHN D. BRENNAN,
MICHAEL D. KOEHS, and RAYMOND A.
AHONEN,

                        Defendants.
_____/

Case No. 04-60160
HON. MARIANNE O. BATTANI

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

      Before the Court are Defendants' Motion for Partial Summary Judgment of
Plaintiff Kenneth G. Meerschaert, Sr.'s Claims (Doc. No. 40); Defendants' Motion for
Partial Summary Judgment of Plaintiff Geoffrey E. Smiths' Claim (Doc. No. 41);
Defendants' Motion for Partial Summary Judgment of Plaintiff Thomas L. Habel's Claim
(Doc. No. 42); Defendants' Motion for Partial Summary Judgment of Plaintiff David W.
Herczeg's Claims (Doc. No. 43); and Defendants' Motion for Partial Summary Judgment
of Plaintiffs' Claims Against Macomb Township (Doc. No. 44). The Court heard oral
argument on November 16, 2005. The Court requested additional briefing from the
parties, and at the conclusion of the hearing, the Court took the matter under
advisement. The Court has considered the supplemental pleadings, and, for the
reasons that follow, the Court GRANTS in part and DENIES in part Defendants' Motion

-1-

for Partial Summary Judgment of Plaintiffs' Claims Against Macomb Township ("Township"),  Defendants' Motion for Partial Summary Judgment of Plaintiff Thomas L. Habel's Claims, and Defendants' Motion for Partial Summary Judgment of Plaintiff Kenneth G. Meerschaert, Sr.'s Claims and DENIES the other motions.

## I. BACKGROUND

Plaintiffs Thomas L. Habel ("Habel"), David W. Herczeg ("Herczeg"), Kenneth G. Meerschaert (Meerschaert"), and Geoffrey E. Smith ("Smith") are firefighters who previously  worked or continue to work for the Macomb Township Fire Department. They filed this action, alleging that Defendants Macomb Township, John D. Brennan, the Macomb Township Supervisor, Raymond A. Ahonen, Chief of the Macomb Township Fire Department, and Michael D. Koehs, the Clerk of Macomb Township, violated Plaintiffs' First Amendment rights (Count I),  interfered with the business relations and employment of Habel (Count II), and interfered with advantageous business relations of Meerschaert (Count III).  The facts giving rise to these claims specific to each Plaintiff follow.

### A.    Plaintiff Meerschaert

In 1981, Meerschaert began working with the Macomb Township Fire Department ("Fire Department") as a part-time firefighter.  In 1990, he became a full-time employee, classified as a Maintenance Sergeant, and in 1995, he was promoted to Captain.  During his twenty-year career with the Fire Department, Meerschaert was never disciplined until the events giving rise to this lawsuit.

In 2000, Ahonen recommended that Meerschaert be promoted to Assistant

Chief.  In that position, Meerschaert had the responsibility to train on-call firefighters.

During his tenure, Meerschaert became concerned about perceived staffing and training

inadequacies in the Fire Department.  First, Meerschaert did not believe that the

Township was adequately staffed in its community services, including the Fire

Department, given the rising population of the Township between 1990 and 2001.

Second, many firefighters were not attending the training sessions.  He suggested to

Ahonen that those not attending be disciplined, but Ahonen disagreed.   Meerschaert

not only shared his concerns with Ahonen and Brennan, he voiced his concerns to

community residents on numerous occasions.

Meerschaert became more vocal after the Fire Department failed to respond to a

call made because his daughter-in-law was choking.  He was particularly angry because

he had voiced such safety concerns to Ahonen and Brennan without success.  Among

those incidents Meerschaert brought to public attention was the failure of a firefighter to

attend mandatory training on an ariel ladder because he was afraid of heights.

Meerschaert eventually contacted the Township attorney to discuss his safety

concerns.  Meerschaert talked to Township officials, including Brennan and Koehs,

spoke to the residents of the community, and voiced his concerns to the press.  Several

articles did appear in newspapers.  As a result, Brennan, through Ahonen, issued an

order requiring all media inquires regarding the Fire Department be directed to Ahonen

or Brennan.

After Meerschaert went public with his concerns, his relationship with Ahonen

began to deteriorate.  He was instructed to call dispatch and check-out from his fire

service phone on the air.  Meerschaert was reluctant to comply; whenever he did, his

family received crank calls.

On October 28, 2002, Meerschaert attended a Township meeting, and once again, tried to voice his concerns about the Fire Department to the necessary officials. Brennan, Ahonen, and Koehs exhibited such hostility toward Meerschaert at this meeting, he felt forced to leave.  Two days later, several employment actions were taken against him: (1) he was disciplined for not signing off over the air; (2) he was reprimanded for taking records to the meeting; (3) he was transferred to another station; (4) he was denied access to a computer that he needed to perform his job duties as a trainer; (5) he was denied use of a department vehicle; (6) he was required to report to a subordinate; (7) he had his keys taken away from him; and, (8) he was denied access to files he needed to perform his job.

Following the October 28, 2002, meeting, Plaintiffs got together and prepared a flyer, which was distributed to approximately 250 community residents.  The flyer addressed the safety and training issues in the Fire Department.  It included statements about Brennan's lack of concern for the safety of the community, and requested community residents to come to the next board meeting.  When Brennan and the other Defendants heard about the flyer, they became enraged.

About two weeks later, on November 14, 2002, while Meerschaert was manning the fire station, a call came in requesting emergency medical attention.  Because the dispatcher did not provide a clear address of the emergency, Meerschaert waited to verify the address, and two other firefighters covered the run.  Meerschaert subsequently left work to take his wife to a doctor's appointment.  Meerschaert was notified weeks later that he was being suspended for forty-five days for neglect and

-4-

evasion of duties on that day.  Meerschaert viewed that action as retaliation for his speaking out about concerns regarding the Fire Department.

Because of all of the adverse employment actions that had been directed toward him, Meerschaert believed that grieving his suspension would be futile.  Meerschaert felt forced to resign and did so in January 2003.

After resigning, Meerschaert applied for a position with a private contractor, Jarvis Construction, which specializes in fire repair construction.  Meerschaert did not get the job.  According to Meerschaert, Ahonen, at Brennan's behest, indicated that the contractor would not be welcome at any fire if Meerschaert were hired.

### B.    Plaintiff Habel

Habel began his employment with the Fire Department in 1982, as a part-time firefighter.  He was promoted to Lieutenant in 2000, at the recommendation of Ahonen. Habel also worked as a Deputy Sheriff of the Township for nine years.

Habel and Ahonen initially had a good relationship.  According to Habel, that relationship deteriorated in 2002, when Habel began to voice his concerns to Brennan and Koehs about the need for more personnel, stricter enforcement of training requirements, and more safety education.  He indicated that response times of fire runs were inaccurate because fire suppression services could not begin at the time recorded--when the first on-call firefighter arrived on the scene, but only after equipment arrived. Habel, when assisting Meerschaert in conducting CPR classes in the community, expressed those concerns to the public.

As the Township began experiencing adverse publicity, Habel began to experience incidents he describes as harassing.  He asserts that he and Meerschaert

were not invited to the Fire Department's awards ceremony honoring those who served twenty years or more as firefighters for the Township. Both had twenty or more years with the Fire Department.

Later, when Habel met with Ahonen about a discipline issue, Ahonen mentioned Habel's derogatory and offensive remarks about the Fire Department and Ahonen, but assured Habel he was "not here to trample anyone's First Amendment Rights." Habel's Resp. Brief, p. 6. Ahonen refused to respond to Habel's request for specific information as to what was said, but warned Habel that if it continued, discipline would follow. At this meeting, Habel said to Ahonen, "Let's take the gloves off." Habel Dep. at 78, 92.

Finally, Habel notes that on January 16, 2003, while he was at the fire station, Ahonen arrived. Ahonen interrupted Habel's conversation with another firefighter and declined to respond to Habel's greeting. When Ahonen was leaving the sation, Habel said, "Chief, you drive careful out there." Id. at 110. Later that evening, Habel was attending a union meeting for the Police Department when he received notice from his union representative that he was suspended from the Fire Department. Habel was advised not to step foot on any Township properties. Brennan, Ahonen, and Koehs filed a police report against him for threatening violence against Ahonen. According to Habel, no one conducted an investigation or questioned him about the incident. Further, Habel was advised by his supervisor at the Sheriff's Department that reassignment to a territory outside the Township occurred because Brennan did not want Habel working in the Township.

Habel appealed his suspension from the Fire Department, and in October 2003, through an arbitration procedure, he was reinstated, although not to his previous

-6-

position.  Since his return, Habel says he has continued to experience adverse impacts on both of his jobs.  For example; he was not promoted to a sergeant position with the Sheriff's Department despite being qualified.  According to Habel, he was ninth on a list of 24 eligible candidates.  All deputies above his ranking on the list were promoted as well as eight people lower on the list.  Further, Koehs refused to allow him to patrol the Township.  Finally, Habel asserts that he has been intentionally embarrassed by being ordered to wash fire trucks, an assignment reserved for those of lower ranking.

### C.    Plaintiff Herczeg

Herczeg began his employment with the Township as a probationary firefighter in November 2001.  Consequently, he was paid only when he made a run.

In late 2002, Herczeg was on duty with Smith when a Michigan Occupational Safety and Heath Act ("MIOSHA") investigator arrived for a surprise visit.  A command officer approached Herczeg and Smith and instructed them to hide any unmarked chemicals.  In addition, Ahonen reminded Herczeg that he was a "probational firefighter," and thus could be terminated for cause or no cause at all.  Herczeg's Resp. Brief, pp. 4-5.  Herczeg declined to do as instructed.

After the MIOSHA incident, Ahonen ignored Herczeg.  Although a written evaluation of his work was satisfactory, Herczeg was terminated several months later.  Ahonen recommended Herczeg's termination to the Board, without explanation.

According to Herczeg, his views about safety and training were known to Defendants.  He assisted Meerschaert in moving belonging after Meerschaert's transfer.  Ahonen admitted knowledge of the Herczeg's association with other disgruntled

firefighters.  Ahonen Dep. at 319.  Moreover, Herczeg attended Township board
meetings to support Habel.

### D.    Plaintiff Smith

In February 2000, Plaintiff Smith applied for a position as a part-time firefighter
with the Township.  Ahonen recommended to the Board that Smith be hired, and he
was.

During his first two years of employment, Smith experienced no problems with
Ahonen.  In the Fall of 2002, Smith became concerned about the safety training,
staffing, and response time for the firefighters.  Smith talked to reporters and residents
about the MIOSHA violations.  His name appeared in numerous newspaper articles,
where he was cited as speaking to the safety concerns, the need for a more advanced
Fire Department, a lack of manpower, and how and where the Township was wasting
tax dollars.  Smith assisted in the preparation of the flyers that were sent out to
residents in the community.

Smith contends that his concerns were known to Koehs and Ahonen, who
eventually treated him differently.  He asserts that this was about the same time that
Habel was discharged, and Meerschaert was disciplined.  Smith contends that it was
also about the same time that the MIOSHA inspectors discovered multiple violations by
the Fire Department.  According to Smith, Defendants targeted him.  Specifically, he
asserts that his number of runs was limited; Ahonen shunned him; his accessibility to
dispatch was restricted; he did not receive new keys to the station after the locks were
changed; and, charges were continually brought against him.  Four charges were

-8-

brought in May 2003, and two in June 2003.  Smith was disciplined in June and July

2004.  Once this lawsuit was filed, however, the charges against him ceased.

For the most part, Defendants advance the same arguments for dismissal of

Plaintiffs' 42 U.S.C. § 1983 claims against them.  They contend that Plaintiffs' claims

that their First Amendment rights were violated must be dismissed because, as a matter

of law, Plaintiffs' speech was not of public concern, and even if it were, Defendants'

interest in maintaining a united workforce outweighed Plaintiffs' rights to speak out.  In

the alternative, Defendants maintain that they are entitled to qualified immunity.

Defendants also request dismissal of Herczeg's federal claim on the ground that

Herczeg did not engage in any speech and did not suffer an adverse action.

Defendants likewise challenge whether Smith can make a *prima facie* case of retaliation

in that he did not suffer an adverse action.

Defendants further ask the Court to dismiss the federal claims against Defendant

Macomb Township because Plaintiffs failed to allege that the violations took place

pursuant to a municipal policy or custom.  In the alternative, Defendants request

dismissal of the federal and state claims against Macomb County on immunity grounds.

Finally Defendants ask the Court to dismiss the state claims against them

because Habel and Meerschaert failed to establish genuine issues of fact regarding

those claims.  In the alternative, Defendants argue that they are entitled to

governmental immunity as to the state-law claims.

## II.  STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  As the United States Supreme Court has ruled:  In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact.  See Hager v. Pike County Bd. of Educ., 286 F.3d 366, 370 (6th Cir. 2002).  "[T]he burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to  support the nonmoving party's case."  Celotex, 477 U.S. at 325.

Once the moving party carries that burden, the burden then shifts to the nonmoving party to set forth specific facts showing a genuine triable issue.  Fed. R. Civ. P. 56(e); Chao v. Hall Holding Co., 285 F.3d 415, 424 (6th Cir. 2002).  "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict."  Anderson v. Liberty Lobby Inc., 477 U.S. 242,  256 (1986).  The court must view the evidence in a light most favorable to the nonmovant as well as draw all

-10-

reasonable inferences in the nonmovant's favor.  See Hunt v. Cromartie, 526 U.S. 541,

549 (1999); Sagan v. U.S., 342 F.3d 493, 497 (6th Cir. 2003).

"A fact is 'material' and precludes grant of summary judgment if proof of that fact

would have [the] effect of establishing or refuting one of the essential elements of the

cause of action or defense asserted by the parties, and would necessarily affect [the]

application of appropriate principle[s] of law to the rights and obligations of the parties."

Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted) (quoting

BLACK'S LAW DICTIONARY 881 (6th ed. 1979)).  To create a genuine issue of material

fact, the nonmovant must do more than present some evidence on a disputed issue.

> There is no issue for trial unless there is sufficient evidence
> favoring the nonmoving party for a jury to return a verdict for
> that party.  If the [nonmovant's] evidence is merely colorable,
> or is not significantly probative, summary judgment may be
> granted.

Anderson, 477 U.S. at 249-50.  "No genuine issue of material fact exists when

the 'record taken as a whole could not lead a rational trier of fact to find for the non-

moving party.'"  Michigan Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 534 (6th

Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

587 (1986)).

The evidence itself need not be the sort admissible at trial.  Tinsley v. General

Motors Corp., 227 F.3d 700, 703 (6th Cir. 2000).  However, the evidence must be more

than the nonmovant's own pleadings and affidavits.  Smith v. Campbell, 250 F.3d 1032,

1036 (6th Cir. 2001).  The mere existence of a scintilla of evidence in support of the

non-movant is not sufficient; there must be sufficient evidence upon which a jury could reasonably find for the non-movant.  Anderson, 477 U.S. at 252.

III.    Analysis

To prevail on a § 1983 claim, a plaintiff must establish (1) that a person acting under color of state law (2) deprived the plaintiff of a right secured by the Constitution or laws of the United States."  Waters v. City of Morristown, 242 F.3d 353, 358-59 (6th Cir. 2001).  With respect to the "color of state law" issue, an official is acting under the color of state law if, and only if, the alleged misconduct is "related in some meaningfully way either to the actor's governmental status or to the performance of his duties. "  Id.  There is no dispute that Defendants were acting under the color of state law.  In their motions, Defendants challenge whether Plaintiffs were deprived of any constitutional right. Defendants further assert that Ahonen, Brennan and Koehs are entitled to qualified immunity.  Finally, Defendants raise the sufficiency of the pleadings as to the Township.

A.  First Amendment claims

To make out a *prima facie* case of a First Amendment retaliation claim, Plaintiffs must show:  (1) they were engaged in constitutionally protected speech/association; (2) they were subjected to adverse actions that caused them to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that conduct; and, (3) the adverse actions were motivated at least in part by the protected conduct. Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999).  Because Plaintiffs are public employees, they also must demonstrate that their speech implicated a matter of public

interest or concern, and their interest in taking up the matter of public concern outweighs Defendants' interests, as employers, "in promoting the efficiency of the public services it performs through its employees."  Pickering v. Bd. of Educ. of Township High Sch. Dist., 391 U.S. 563, 568 (1968).

If Plaintiffs establish their *prima facie* case, then the burden of persuasion shifts to Defendants to show that there were other reasons for the adverse actions. Defendants must also show that those actions would have resulted, even if Plaintiffs had not engaged in the protected activity at issue.  Leary v. Daeschner, 349 F.3d 888, 898 (6th Cir. 2003).

## I.  Was Plaintiffs' speech protected?

Generally, it is appropriate to find that speech implicates a matter of public concern when it informs the community that a government entity has failed to discharge its governmental responsibilities or has engaged in "actual or potential wrongdoing or breach of public trust."  Connick v. Myers, 461 U.S. 138, 148 (1983); See also Lucas v. Monroe County, 203 F.3d 964 (6th Cir. 2000).  Whether an issue is a matter of public concern is a matter of law for the court.  Bonnell v. Lorenzo, 241 F.3d 800, 809-10 (2001).

In Farhat v. Jopke, 370 F.3d 580, 590-91 (6th Cir. 2004), the appellate court articulated guidelines for the lower courts to follow when deciding whether speech is of public concern.

1.      Speech is of public concern if it involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.

-13-

2.      The fact that the public employee engages in the speech while in the course of his or her employment does not preclude a finding that the speech touches upon a matter of public concern.

3.      The employee's motive for engaging in the speech in question is a relevant, but not dispositive, factor when considering whether an employee's expression is of public concern.

4.      Although First Amendment protection might not be available if the employer can show that the public employee knowingly or recklessly made false statements, a public employee is not required to prove the truth of his or her speech in order to secure the protections of the First Amendment.

Id. (internal footnotes and citations omitted).  The Sixth Circuit previously observed that "[i]n order to conclude that speech addresses a matter of public concern, 'this court must be able to fairly characterize the expression as relating to any matter of political, social, or other concern to the community." Chappel v. Montgomery County Fire Prot. Dist., 131 F.3d 564, 578 (6th Cir. 1997).  The Chappel Court observed that "[s]peech on matters directly affecting the health and safety of the public," including the need for improved training, is "obviously a matter of public concern."  Id.

Defendants' challenge to whether Plaintiffs' speech qualifies as touching on public concern is built upon their characterization of the topics discussed by these Plaintiffs as dealing first and foremost with Plaintiffs' own personal interests.  For example, Defendants focus on Plaintiffs' speech about matters of internal office politics and general Township Fire Department efficiency.  Defendants' analysis is based on a myopic view of Plaintiffs' speech, and therefore, their reliance on Colburn v. Trs. of Ind. Univ., 973 F.2d 581 (7th Cir. 1992), as support for their position is misplaced.  The facts are distinguishable.

-14-

In Colburn, two, disgruntled university professors feuded with the administration regarding how the department was maintained and particularly over the tenure review process.  Id. at 583.  The Seventh Circuit found that the plaintiffs were not speaking primarily as citizens, but as faculty members concerned about the private matter of the process by which they were evaluated.  Consequently, the court found that speech about unfair treatment did not implicate statements of public concern.  Id. at 588.

In contrast, Plaintiffs' speech here was not exclusively about personal employment issues; rather, much of their speech concerned the well-being of the public in general.  Unlike the professors in Colburn, Plaintiffs here also spoke about safety and training issues, bringing these concerns to the attention of the general public and the administration of the Township.

The flyer prepared by Plaintiffs and circulated to community, urged citizens to contact their elected officials in regard to the safety and training issues of the Fire Department.  Plaintiffs spoke to fellow firefighters, Township Board members, deputies, command officers, newspaper reporters, and the media.  Moreover, Habel and Meerschaert testified that they spoke to Brennan and Koehs about the staffing issues and that short staffing was placing its citizens and deputies at risk.  Plaintiffs also testified they spoke about deficiencies in training.

On the basis of the Sixth Circuit's opinion in Chappel, supra, topics of firefighter safety, firefighter training, and response time are matters of public concern.  Here, Plaintiffs repeatedly accused the Fire Department of being insufficiently staffed and of inadequate training of on-call firefighters.  As noted by the Sixth Circuit, "Freedom to

criticize public officials and expose their wrongdoing is at the core of First Amendment values, even if the conduct is motivated by personal pique or resentment." Barrett v. Harrington, 130 F.3d 246, 263 (6th Cir. 1997). The First Amendment protects Plaintiffs' rights to voice concerns and criticize Ahonen, Brennan, and Koehs and their policies. See Glasson v. City of Louisville, 518 F.2d 899, 904 (6th Cir. 1975 ("the right of an American citizen to criticize public officials and policies and to advocate peacefully ideas for change is the central meaning of the First Amendment") (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 273 (1964)).

Defendants' efforts to exclude Herczeg from this analysis based on his failure to identify any speech on his part fail. In addition to freedom of speech, the First Amendment implicitly protects the corresponding freedom to expressive association. Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984) ("we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends"). The First Amendment protects associational and assembly rights in two distinct ways: "First, the Court has held that the Constitution protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships. Second, the Court has upheld the freedom of individuals to associate for the purpose of engaging in protected speech or religious activities." Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 544, (1987). Therefore, Herczeg's claim that Defendants retaliated against him because of his association with the other Plaintiffs, who were

engaging in protected speech, likewise survives summary judgment.  See Boals v. Gray, 775 F.2d 686, 692 (6th Cir. 1985) (there is "no logical reason for differentiating between speech and association in applying Connick to first amendment claims").  In sum, Plaintiffs' efforts to expose the inadequacies of the Fire Department fall within the scope of content deemed matters of public concern.  Defendants' arguments to the contrary fail to persuade the Court that summary judgment is required on this ground.

### 2.  **Pickering** balance

Next, the Court must determine whether Plaintiffs' "interest in making such statements outweighs the interest of the [Township], as an employer, in promoting the efficiency of the public services it performs through its employees."  Pickering, supra at 568.  Because Plaintiffs' speech "substantially involve[d] matters of public concern," Defendants must "make an even stronger showing that their interests in regulating [their] speech outweighed [Plaintiffs'] interest in speaking."  Cockerel v. Shelby County School District, 270 F.3d 1036, 1053 (6th Cir. 2001).

Defendants contend they acted reasonably in order to maintain a positive work environment in light of the negativity Plaintiffs projected onto the Fire Department.  As support for their position, Defendants cite to Brown v. City of Trenton, 867 F.2d 322-23 (6th Cir. 1989).  Defendants' reliance is misplaced.  In Brown, the Court found that the plaintiffs were speaking about matters of personal rather than public concern.  Consequently, the facts of Brown are not analogous to the situation before this Court.  Here, the Court has deemed Plaintiffs' speech to raise matters of public concern.  In addition, Defendants have failed to produce sufficient evidence of insubordination or

-17-

disruption that would tip the balancing in their favor as a matter of law.  Although a Fire

Department ordinarily should be afforded great leeway in disciplining insubordinate

firefighters, it is not a self-evident proposition that firefighters who defy a Chief's order

by speaking out about the Fire Department or even criticizing it committed an act of

insubordination that threatens its efficiency.  Defendants failed to produce evidence that

the threat of insubordination in this case was so great as to outweigh the public's

interest in an informed discussion about the inadequacies of the Fire Department.  See

Solomon v. Royal Oak Township, 842 F.2d 862, 866-67 (6th Cir. 1988) (finding

insufficient evidence where the plaintiff broke the chain of command, issued statements

questioning his superior's work performance and acted in ways deemed disloyal by the

defendant).

Accordingly, the Pickering balancing test favors Plaintiffs.  Indeed the First

Amendment retaliation cause of action was designed to prevent attempts by officials to

silence public employees.  As the United States Supreme Court recently stated:

> Underlying the decision in Pickering is the recognition that public employees are
> often the members of the community who are likely to have informed opinions as
> to the operations of their public employers, operations which are of substantial
> concern to the public.  Were they not able to speak on these matters, the
> community would be deprived of informed opinions on important public issues.
> The interest at stake is as much the public's interest in receiving informed
> opinions as it is the employee's own right to disseminate it.

City of San Diego v. Roe, 543 U.S. 77, 81 (2004).

### 3.  Adverse actions

Defendants challenge whether either Smith or Herczeg suffered an adverse

action.  The Court finds that there is sufficient evidence to show that they did.

-18-

First, Defendants assert that Herczeg, who was a probationary employee, could be terminated for any reason.  Further, they insist that Herczeg was fired for failing to comply with a direct order, which they conclude compels an award of summary judgment.  The record shows that Herczeg was terminated without a stated reason.  Although Herczeg was a probationary employee and as such could be terminated for any reason, the law prohibits his termination for exercise of First Amendment association rights.  Rankin v. McPherson, 483 U.S. 328, 383-84 (1987).  Herczeg has advanced additional evidence that he was ignored by Ahonen after his affiliation with the other Plaintiffs became known to Defendants.  Viewing this evidence in the light most favorable to Herczeg reflects a genuine issue of material fact as to whether Herczeg suffered an adverse action.

In their request for summary judgment as to Smith, Defendants rely on Title VII case law to support their contention that the conduct at issue merely resulted in hurt feelings or bruised egos, and therefore, is insufficient as a matter of law to establish any adverse action.  See Smith v. City of Salem, 378 F.3d 566, 575-76 (6th Cir. 2004) (requiring a plaintiff to show a materially adverse change in the terms and conditions of [his] employment).  Defendants' analysis is misguided.

The Title VII standard is articulated differently than the First Amendment retaliation standard.  Smith's burden is to show that he was subjected to adverse actions that caused him to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that conduct.

-19-

Here, Smith has proffered sufficient evidence to show the existence of a genuine issue of material fact as to whether the actions to which he was subjected would chill a person of ordinary firmness. Smith had no disciplinary problems within the department until he spoke out about the issues regarding response times, staffing, and safety. He suffered adverse employment actions in the form of multiple disciplinary actions, reduced runs and presumably pay, and loss of keys to the station and presumably status.

In sum, Defendants have failed to show as a matter of law that Herczeg and Smith's injuries were insufficient as a matter of law to chill a person of ordinary firmness from continuing to engage in such conduct.

### 4.    Defendants' Motivation

Because Plaintiffs "[have] successfully established for purposes of the summary judgment the [necessary] elements of [their] First Amendment retaliation claim, the burden of persuasion shifts" to Defendants. Cockrel, 270 F.3d at 1056. As Defendants are the moving party and bear the ultimate burden of persuasion on this issue, they must establish that "the evidence is such that *every* reasonable juror would conclude that [they] have met their burden of showing that [plaintiffs] would have [suffered adverse employment actions] even had [they] not" voiced their opinions to the necessary officials and the community at large. Id. 1057. Defendants have not met their burden.

Contrary to Defendants' assertions, there is sufficient evidence to indicate that the content of Plaintiffs' speech was considered by Defendants. Brennan issued an

order forbidding firefighters from speaking to the media; Ahonen identified a group of

"disgruntled" firefighters and described their meeting place as the "mothership."  Ahonen

Dep. at 93-9, 145-56, 272.  Brennan's comments at a Township board meeting in

November 2002, reflect his awareness of the flyer.  Defendants do not assert by

affidavit or deposition testimony that they were unaware of Plaintiffs' activities.

The temporal proximity of the adverse actions suffered by Plaintiffs relative to

their protected activity as well as their unblemished records prior to speaking out

creates an inference that Defendants acted in retaliation.  After Plaintiffs voiced their

concerns, they were subjected to adverse actions that would deter a person of ordinary

firmness from continuing to engage in publicly criticizing the Chief and his Fire

Department.  There is clearly a question of fact for a jury to determine by a

preponderance of the evidence as to whether Defendants' decisions to suspend Habel

and Meerschaert, terminate Herczeg, and change the working conditions for Smith were

substantially motivated by Plaintiffs' activities relating to their speech.  The viability of an

employer's alternative explanation is a factual issue, and Defendants have failed to

produce overwhelming evidence in support of their position.  Accordingly, summary

judgment on this ground is denied.  Because the Court has found a genuine issue of

material fact as to all claims of retaliation, the Court considers the availability of

immunity.


**B.     Qualified immunity**

Qualified immunity is an affirmative defense that shields government officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "The entitlement is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

The United States Supreme Court has set forth a two-prong test to determine whether a defendant is entitled to qualified immunity. Saucier v. Katz, 533 U.S. 194, 200 (2001). The first prong requires the court to inquire whether the facts, viewed in the light most favorable to the plaintiff, "show the [defendant's] conduct violated a constitutional right." Id. at 201. The court must "concentrate at the outset on the definition of the constitutional right and [then] determine whether on the facts alleged, a constitutional violation could be found. . . ." Id. at 207. If a constitutional violation is found, the second prong requires the court to decide whether a reasonable official would, at the time the act was committed, understand that his conduct violated that right. Id. at 201. An official is entitled to immunity when the conduct does not amount to a violation of a clearly established right of which a reasonable person would have known. Harlow, supra at 818. A right is established when "it would be clear to a reasonable [official] that his conduct was unlawful in the situation that he confronted." Saucier, supra at 202.

Defendants first argue that they are entitled to qualified immunity because no constitutional violation occurred. This argument fails given the Court's finding that the

facts, when viewed in the light most favorable to Plaintiffs, demonstrate the existence of genuine issues as to the retaliation claims.  Further, Defendants' argument reflects a fundamental misunderstanding about the doctrine of qualified immunity–if no constitutional violation occurred, immunity is not needed.

Next, Defendants argue that even if they did violate Plaintiffs' constitutional rights, they acted reasonably in light of their need to maintain a positive work environment.  Again this assertion does not aid the analysis.  Without question, a reasonable officer would have known that taking disciplinary action to punish free speech violated clearly established rights.  It was clearly established, at least as of 1983, that a public employer may not terminate employees for exercising their First Amendment rights of freedom of speech.  See Connick, 461 U.S. at 138.  If Plaintiffs' exercise of their First Amendment rights to freedom of speech and association were a substantial factor in Defendants' decision to terminate, suspend, or take action against them, and Plaintiffs' interests outweigh Defendants' interest in promoting efficiency in public services, then Defendants' actions cannot be deemed reasonable. Thus, Defendants are not entitled to qualified immunity.

### C.     Liability of Township

The parties do not contest whether the Township can be held liable for a violation of Plaintiffs' constitutional rights.  A municipality may be held liable under § 1983 when a city's policy or custom caused the injury or was the moving force behind the constitutional violation.  Monell v. Dept of Soc. Servs., 436 U.S. 658, 694 (1978). Moreover, municipal liability may arise with regard to an employment decision provided

-23-

that the decisionmaker "possesses final authority to establish municipal policy with

respect to the action ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)

(footnote omitted).  The Pembaur Court found:

> [A] government frequently chooses a course of action
> tailored to a particular situation and not intended to control
> decisions in later situations.  If the decision to adopt that
> particular course of action is properly made by that
> government's authorized decisionmakers, it surely
> represents an act of official government "policy" as that term
> is commonly understood.  More importantly, where action is
> directed by those who establish governmental policy, the
> municipality is equally responsible whether that action is to
> be taken only once or to be taken repeatedly.

Id. at 481.  Thus, the Supreme Court recognized that governmental entities often

spread policymaking authority among various officers and official bodies.  Therefore,

particular officers may have authority to establish binding township policy respecting

particular matters and to adjust that policy for a township in changing circumstances.

Municipal liability can attach to a single decision made by township policymakers.

That theory is the basis upon which Plaintiffs proceed.  Specifically, they contend

that the Township is liable for the alleged violation of their First Amendment rights

because the individual defendants had final authority to establish municipal policy.

The issue, raised belatedly by Defendants, is whether municipal liability is

adequately pleaded in the Complaint.  This Court finds that it is.  In assessing the merits

of a motion to dismiss under Fed.R.Civ.P. 12 (b)(6), the Court must construe the

complaint in the light most favorable to plaintiff, accept all factual allegations as true,

and determine whether plaintiffs undoubtedly can prove no set of facts in support of

-24-

their claims that would entitle them to relief.  Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).   On that basis, the Court finds that Plaintiffs' complaint is not so fatally flawed that their legal premises are destined to fail.

In the general allegations as well as in paragraphs 5-7 and 14 of the Complaint, Plaintiffs sufficiently address the transactions, events and occurrences that support their § 1983 claim.  There is no confusion as to the theory of liability upon which Plaintiffs have proceeded.  The parties have engaged in discovery, and Plaintiffs have raised genuine issues of material fact as to whether Ahonen, Brennan, and Koehs were exercising their policy-making authority when imposing disciplinary actions upon these Plaintiffs.  Accordingly, Macomb Township's request for summary judgment on the federal claims for failure to state a claim upon which relief can be granted is denied.

In sum, the Court has found that Plaintiffs' federal claims survive Defendants' motions for summary judgment.  The Court therefore directs its attention to the state law claims.

### D.    State Claims

For Meerschaert and Habel to succeed on their state law claims, they must show the following:  "the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy; knowledge of the relationship or expectancy on the part of the interferer; an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted."  Winiemko v. Valenti, 513 N.W.2d 181, 184 (1994).  Not all interferences give rise to a claim for relief; however, the interference

must be "improper."  Id.  An improper interference "requires both the absence of

justification and the purpose of interfering with plaintiff's contractual rights or plaintiff's

business relationship or expectancy."  Id. at 185, n. 3 (citation omitted).

Defendants' first challenge to the state claims arises out of their contention that

any interference was justified.[1]  With regard to Meerschaert's intentional tort claim,

Defendants admit that they advised his prospective employer, Jarvis Construction, that

the Township would not engage the company's services if it employed Meerschaert.

Defendants nevertheless contend that they were justified in telling Jarvis Construction

that they mistrusted Meerschaert and that they lacked confidence in his ability to

respond to runs in the Township.

Defendants also contend that they were justified in reporting Habel's threatening

behavior toward Ahonen to Habel's superiors at the Sheriff's Department.  According to

Defendants, Habel's words showed a lack of respect and loyalty to the Township.

Neither justification entitles Defendants to summary judgment.  Plaintiffs have

presented deposition testimony, affidavits, and other documentary evidence to support

that position that Defendants retaliated against them for exercising their constitutional

rights.  Looking at that evidence and the justifications advanced by Defendants, this

Court finds that Habel and Meerschaert both have met all the necessary requirements,

---

[1] Defendants framed this argument as one of immunity. In Michigan, individual government employees cannot seek immunity for their intentional torts. Jones v. Powell,577 N.W.2d 130, 133 (1998); see also Sudul v. City of Hamtramck, 562 N.W.2d 478, 479 (1997) (holding that "an individual employee's intentional torts are not shielded by our governmental immunity statute").  Habel and Meerschaert both allege intentional torts in relation to business.  Accordingly, the Court has disregarded the label and addresses the argument on the merits.

as outlined above, to satisfy their *prima facie* case.  Defendants' lack of confidence in Meerschaert's ability to respond to runs may have been relevant to a firefighter position, but that was not the job he would have performed for Jarvis Construction.  Likewise, the Court finds Defendants' explanation relative to Habel fails to show justification as a matter of law.  A concern with Habel's loyalty to the Township and his conflict with a supervisor at the Fire Department do not show justification as a matter of law in reporting Habel to the Sheriff's Department.  Because the Court finds Plaintiff's prima facie cause survives summary judgment on the merits, it considers Defendants' claims of immunity.

### 1. Township immunity

The parties dispute whether the Township can be held vicariously liable for the actions o f Ahonen, Brennan and Koehs.  Under Michigan law, government agencies are immune from tort liability when they are engaged in the exercise or discharge of a government function.  MICH . COMP. LAWS § 691.1407 (1).  "A governmental agency can be held vicariously liable only when its officer, employee, or agent, acting during the course of employment and within the scope of authority, commits a tort while engaged in an activity which is nongovernmental or proprietary, or which falls within a statutory exception."  Ross v. Consumers Power Co., 363 N.W.2d 641, 663 (1984).

Based on the statute and case law interpreting it, the Court rejects Plaintiffs' argument that the Township is vicariously liable for Defendants' actions because interference with prospective employment is a non-governmental activity.  Plaintiffs' focus on specific acts to resolve the issue, rather than the general activity, has been

foreclosed by the Michigan Supreme Court.  See Smith v. Dept. of Pub. Health, 410 N.W.2d 749, 778 (1987).  In Smith, the state supreme court specifically declined to craft an intentional tort exception to the Michigan governmental immunity act.  Id.  The Smith Court clarified that when determining whether a government agency is liable, the focus is on "the *general activity*, not the *specific conduct*, involved at the time the alleged tort occurred.  Id. at 778 (emphasis in the original).  "[T]o use anything other than the general activity standard would all but subvert the broad governmental immunity intended by the Legislature" because it would be difficult to envision a tortuous act that is a governmental function.  Id. at 779.  The term "governmental function" is broadly construed as "an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law."  MICH. COMP. LAWS. § 691.1401(f); Maskery v. Univ. of Michigan Bd. Of Regents, 664 N.W.2d 165, 167 (2003).

The Court is duty-bound to apply the Michigan immunity statute to this case. Here, it is apparent that Ahonen, Brennan and Koehns were engaged in a governmental function at the time they gave employment information to the Sheriff's Department and Jarvis Construction.  Although the individual defendants may have committed an intentional tort while performing their duties, the Township retains its immunity because the general activity of hiring and firing as well as employee evaluation is authorized by law.

## 2.  Immunity for Brennan

Defendants contend that Brennan is entitled to immunity under Michigan law.  In Ross, 363 N.W.2d at 663, the Michigan Supreme Court held that the highest executive officials of all levels of government are absolutely immune from all tort liability whenever they are acting within their executive authority.  See MICH. COMP. LAWS § 691.1407 (5).[2]

The sole issue in dispute relative to Brennan's immunity is whether he was acting within his executive authority.  In Marrocco v. Randlett, 433 N.W.2d 68, 73 (1988), the court articulated several factors relevant to the determination, including, "the nature of the specific acts alleged, the position held by the official alleged to have performed the acts, the charter, ordinances, or other local law defining the official's authority, and the structure and allocation of powers in the particular level of government."  Because no Michigan case had defined executive authority, the court relied on earlier articulations of the scope of governmental authority.

Defendants maintain that the actions taken by Brennan toward Habel were those within his executive authority, and that one of his job duties was to suspend any employee for wrongdoing.  Thus, he was acting within the scope of his authority as Supervisor when he suspended Habel and ensured that that information would be passed on to the Sheriff's Department.

Defendants posit the same argument regarding absolute immunity for Brennan in regard to the actions taken against Meerschaert.  They believe that Brennan was acting

---

[2]The statute provides, "Judges, legislators, and the elective or highest appointive officials of all levels of government are immune from tort liability for injuries to persons or damages to property whenever they are acting within the scope of their judicial, legislative, or executive authority."

within the scope of his authority when he talked to Meerschaert's prospective employer and Habel's current employer.

Governmental immunity "embraces all activities that are incident to running" the Township.  Russell v. Dep't of Corrections, 592 N.W.2d 125, 127 (1999).  Within these duties are the hiring and firing of personnel, and communicating with current and prospective employers.  Accordingly, Brennan was engaged in a governmental function at the time he gave employment information to the Sheriff's Department and Jarvis Construction.  He is entitled to summary judgment on the state law claims against him.

## IV.    Conclusion

For the above-stated reasons, this Court GRANTS Macomb Township and Brennan summary judgment on the state law claims on the basis of immunity.  All other requests for summary judgment are DENIED.   Accordingly, the Court GRANTS in part and DENIES in part Defendants' Motion for Partial Summary Judgment of Plaintiffs' Claims Against Macomb Township, GRANTS in part and DENIES in part Defendants' Motion for Partial Summary Judgment of Plaintiff Thomas L. Habel's Claims, and GRANTS in part and DENIES in part Defendants' Motion for Partial Summary Judgment of Plaintiff Kenneth G. Meerschaert, Sr.'s Claims.  The Court DENIES Defendants' Motion for Partial Summary Judgment of Plaintiff Geoffrey E. Smiths's Claim and Defendants' Motion for Partial Summary Judgment of Plaintiff David W. Herczeg's Claims.

**IT IS SO ORDERED.**

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE


Date: March 1, 2006


## CERTIFICATE OF SERVICE

Copies of this Order were served upon Gene Bolanowski and Kenneth Lewis on this date by ordinary mail and/or electronic filing.

s/Bernadette M. Thebolt
Case Manager